We call the next case, Martin Operating v. United States. And we'll hear first from Mr. Brouwer. May it please the court, Kip Brouwer on behalf of Martin Operating Partnership. We're here today challenging the following actions of the government. One, the government's tacit approval of Martin's flaring operation and then an 11th hour wrongful denial of that operation despite five months of prior correspondence and planning. Two, the government's failure to conduct a mandatory safety risk analysis prior to its denial of the operation. Three, the government's arbitrary assertion of inapplicable regulations. And four, the government's tortuous silence in dealing with the Marine customer. The district court dismissed Martin's case under the discretionary function exception to the Suits and Admiralty Act and the Federal Tort Claims Act. This dismissal was an error. It's important to note that Martin did not need approval from the Coast Guard, nor did it need to seek permission from the Coast Guard in order to conduct this operation. Martin did so prudently in order to make sure that there was no hitch when they actually went to do the operation. At the point that Martin... Let me make sure. I mean, the briefing said something similar. So this several months' worth of contact with the Coast Guard was more than a courtesy, I suppose. It was an attempt to avoid problems with the Coast Guard once the operation was actually undertaken. And yet the argument is, by you in part, that this long delay by the Coast Guard led to the damages that you are asserting. Those two parts of your argument don't seem quite to match up. Are you at least acknowledging that the Coast Guard had the right under their general authority to maintain safety at this port, to have stopped what you were doing if they became aware of it, and before the actual inspection, stopped what you were doing to purge the hull of the gases, if they thought independently that there was something dangerous about it? Would they have had that authority? Do you acknowledge that, to have stopped the activity? Yes, Your Honor. But in order to exercise that discretion of safety and making that safety determination, there's a prerequisite to that. There's a statute under the Ports and Waterways Safety Act, Section 1224, which requires that a safety analysis be done. The Coast Guard can't just simply raise its finger in the air and say, smells dangerous, feels dangerous, and seek to regulate that activity. Rather, Congress, through the Ports and Waterways Safety Act, has required more in order to I understand that's part of your argument, but I'm just back to sort of the preliminary as to why Martin Operating was contacting the Coast Guard in the first place for something that did not need Coast Guard approval. Could you just expand on that just a bit? Yes, Your Honor. Frankly, it was the operation, the flaring operation, was unique. It wasn't typical. And to be prudent, to make sure that there weren't any delays when Martin sought to do the operation, it gave a courtesy call to the Coast Guard and said, heads up, we're coming in, we're bringing in some equipment in order to do a flaring operation, and planned ahead in order to make sure that there wasn't any problems when it arrived. That's part of Coast Guard's response, it seems to me, at least the captain of the port, I think. Someone had said, we had never seen this before, and we, they didn't use this word, were a about what it was and how to deal with it, how, what authority it fell under. So it seems to me the uniqueness of it is a partial explanation of why the Coast Guard had such trouble in figuring out what to do with it. Is that a fair assessment? Absolutely, it's a fair assessment. The problem is, is that Martin contacted the Coast Guard in October of 2010. The Coast Guard didn't take any consideration or take the time to figure out the uniqueness of the operation until March, when the vessel was in the Port of Tampa, sitting idle. It's that period of five months that was, period that we're complaining of, in part in our briefing and in the district court, that that five-month period required the Coast Guard to do its safety risk assessment in order to determine whether the operation could go forward. You say they did nothing, they did try to get some information from your client about what this operation was like, what it involved, and what did your company provide? Did your company provide to them the specs of the zinc process and all the details and particulars of how it worked? Yes, Your Honor. When did they do that? So in early October, a specific day can't be found in the record, but in early October, a personnel from Martin met with the Coast Guard surveyor on a separate vessel and handed a package to the surveyor and said, we're planning for our certificate of inspection, our inspection upcoming in March. We wanted to provide you this packet, which includes information on a flaring operation that we seek to undergo. And in fact, on October 5th, the Coast Guard responded to that package and said, I received your package. Thank you for giving it to me. We have a few questions. And interestingly, in that October 5th correspondence, the Coast Guard states, what is the purpose of the flaring operation to remove the cargo? So at that time, there was a fairly clear and concise understanding by the Coast Guard of what the operation entailed. Martin responds. Martin also provides additional information. The memorandum from the captain of the port in August 8th of 2011, months after this event had already occurred, states just that, that we received some information about the unit to be used for the flaring operation, including pictures of the unit, but we just couldn't quite tackle what it all entailed. Martin's argument is that the reason it wasn't tackled until the two weeks when the vessel was sitting idle was because it completely ignored the information that was provided the months prior. The fact that the October 5th email was sent by the government, which was, hey, thank you for receiving that information, tell us a little bit more, or tell us why you want to do this operation. It didn't ask for more information about the system. It asked why we were seeking to do that. That's when we argue that a duty activates on behalf of the government. It has undertook to engage Martin on the operation. Martin responded. Martin provided two follow-ups. Martin applied with the Florida Environmental Protection Commission, sent those permits onto the Coast Guard. So the Coast Guard had every understanding over a five-month period what was going to go on. The information was in its books, and it knew that Martin was planning for the operation. It's important to understand that the vessel at issue, the Ponciana, is a valuable piece of equipment. It charters out at $17,850 per day. When Martin planned to have it inspected, it knew that it was going to be out of service for a period of time in order to undergo the inspection. So to plan prudently for that, Martin sought to make sure that there was nothing that could delay or make the inspection longer. It sent information, said, we're going to gas free. Coast Guard says, why are you going to gas free? We say, well, A, it's under special charter, which means that we want to make sure that we can do this as speedily as possible. But two, and importantly, is if the inspection reveals that hot work needed to be done, or if the inspection required, for some reason, a Coast Guard personnel to enter the tanks, a marine chemist would have to certify those tanks as safe for human entry and safe for hot work. And so Martin said the prudent thing to do to make sure everything runs efficiently and according to plan is to gas free prior to our arrival. Martin presented that to the Coast Guard. The Coast Guard didn't object, seemingly acquiesced. Multiple correspondences were sent to follow up. On January 1st of that year, a berth reservation was faxed over to the Coast Guard indicating, hey, we're arriving approximately March 1st, and we're going to be doing this gas free operation. Nothing from the government. Martin arrives March 1st. It's actually en route, the Ponceana vessel's en route from Philadelphia to Florida to the Port of Tampa to do the operation. And as it's coming up to clear the buoy in the Port of Tampa, it's kind of the first time the Coast Guard says, wait a minute, what's going on here? And communication was sent from a Coast Guard personnel would be over to Martin and says, we see that we sent you this email back in October 5th of the prior year asking why you wanted to do this clear operation. Did you respond to this? What's going on? We forwarded the email, which was, remember, twice sent beforehand. This is the third time that same response was sent to the Coast Guard and said, yes, we responded to you. We're here. What's the issue? We had the shipyard where we were booked to do the flaring operation, international ship repair at berth 200 in the Port of Tampa. They likewise started to correspond with the Coast Guard and say, hey, what's going on here? You've known about this for months. Now at the 11th hour, you're coming up and bringing questions. And they showed their perturbedness with the Coast Guard's actions at that time as well. Let me tell you what my concern is. It seemed to me that whether the Coast Guard didn't understand the facts or was negligent, I mean, that's not what the issue is about, as I understand it. I mean, the order was issued out of concern for safety, and the Coast Guard has broad discretion to act for the safety of vessels and the public under the enabling statute, which is 1223. So, I mean, how do you get around the discretionary exception in view of the fact that it was issued because of the concern of the Coast Guard for the safety of the vessel and the port and the public? That's exactly right, Your Honor. That is the nexus question for this court to determine, is whether a mere recitation by the Coast Guard that safety is at issue ultimately allows it to always find that its conduct falls within the discretionary function exception. Section 1223 of the Ports and Waterways Safety Act is exactly as you described. It's a broad stroke of discretion afforded the government for safety purposes. However, Congress understood that and decided that despite the fact that this is a broad grant of discretion under the guise of safety, we have to control that. And so the very next section, section 1224, takes away the broad discretion and it qualifies it. It reads that in carrying out the duties under the . . . Yes, it requires that they do it, but then the question is how they do it. So, I mean, Berkowitz doesn't really carry you very far. Sure, they have to, if it's mandated, then they've got to do that, but then as the matter, they do that and they have discretion in carrying those things out in the application. Yes and no, Your Honor. Yes, they have discretion in how they carry out that, but they don't have discretion, as we argued, to actually do that in the first place. We contend that the Coast Guard never took into account the various factors within the statute and to establish that point, the government says in page 43 of its brief, well, those are the exact factors that the government considered in denying the operation on page 43. But not a single site to the record is indicated in the brief there. Importantly, when you examine the internal correspondence of the Coast Guard from that period, which is at the record . . . 1224 only requires a consideration. Yes, Your Honor, so they have to consider it. So in the record, there needs to be proof that the government looked at things such as the economic impacts and the effects. Clearly they didn't consider Martin's interest. They have to look at environmental factors. Clearly they ignored the Florida Environmental Protection Commission's issuance that the operation could go forward. It also requires them at the earliest possible time to consult with and receive and consider their views of the representatives of the maritime community and the ports authorities. The record shows at 536 to 538 that the Tampa Port Authority signed off on the operation, including its Vessel Traffic Services Group, that it would approve the operation, that the Florida Environmental Commission approved the operation, and that two shipyards in the Port of Tampa had approved the operation, International Ship Repair and C3. So every organization that was involved or all the interested parties that were required to be consulted with sent their information in. It was never considered. There is nothing in the record to show that the government received or understood what was necessary in order for the operation to go forward. Counsel, it seems to me your argument on 1224 is in part saying that the Coast Guard has to go back to first principles every time an issue comes up, and it seems to me that the statute authorizes the Coast Guard to come up with protocols, regulations on how to deal with certain things. The Coast Guard may have fumbled a bit in figuring out which regulation applied, but I would think where all those factors are being considered, at least in part, is when they promulgate the regulations, and they thought you fell under one, and it turns out you didn't. They thought you fell under some other aspect of their general authority and did not. And this 1224 is not, at least in my reading of it at this stage, an obligation each time a barge is headed towards a port that the Coast Guard has to go through all of that. They figure out which regulation controls this activity, and ostensibly that regulation would have been promulgated under that guidance under 1224. That's exactly right, Your Honor. And so when Martin informed the Coast Guard in October that it was going to perform this obligation, or this operation, the Coast Guard had two choices. A, it could assert or apply a regulation that applied, or two, it could rely on its broad safety discretion in Section 1223. It did nothing at that time. In March, when faced with the same question because the vessel was actually at the Port of Tampa, they then started citing inapplicable regulations that have gone through and shown that they don't apply in any manner. In fact, the only safety regulation that was applied, 33 CFR 160.109, is an enabling statute of the Ports and Waterways, a regulation of the Ports and Waterways Safety Act, but it didn't apply to the operation that was to be done because it only applied to safety considerations for onshore operations. And so they didn't even cite to any of the regulatory regulations that would actually apply to the operation at hand. Thank you. Okay. Thank you, Mr. Brough. We have some time left for a call. Okay. Mr. Kearns. May it please the Court. Good morning. Michael Kearns on behalf of the United States. The problem with this argument about Section 1224 and the quote, unquote, activation of the Coast Guard's discretion, the problem is that the subject matter jurisdiction inquiry is a threshold question. Once the Court finds, as the District Court did in this case, that the challenge conduct involved elements of judgment and choice that were grounded in political, social, and economic policy, that's the end of the inquiry. The Court need go no further than that. And this idea that Section 1224 required something more with respect to the discretionary function exception just is not the case. I would point out, counsel has made the point that there is nothing in the record showing that the Coast Guard did, in fact, consider the Section 1224 items that are listed there. There's also nothing in the record that shows that the Coast Guard did not do that. And as we pointed out in our brief, that's exactly what was happening as the Coast Guard was going back and forth. The local captain of the port was going back and forth with her higher headquarters. She was talking to people at the district level. They were talking with people all throughout the Coast Guard about this proposed operation and they were trying to find a way forward for Martin and a way forward to get this operation conducted. So the idea that somehow, because 1224 was not documented, somehow has taken discretion from the Coast Guard is just not a valid argument. Again, the District Court found that the challenge conduct, and again, that's the key, the challenge was the Coast Guard's decision to not allow the operation to go forward. The District Court ruled, again, that that decision was grounded in, involved elements of judgment and choice, was grounded in social, economic, and political policies. Your argument basically is, it seems to me, that so long as it's a matter of safety that it would fall under the discretion of the Coast Guard, that however misunderstood that authority was by the Coast Guard, no matter how maybe negligent, without conceding anything, how negligent the Coast Guard may have been, the discretionary function applies instantaneously when we can categorize this conduct as safety directed towards activity at a port. Is that a fair statement? It's a fair statement, and I would also say that the discretionary function exception exempts conduct from liability. As you point out, even where the discretion is exercised negligently, even where there's an abuse of discretion, the discretionary function exception protects that conduct. Well, you might have a problem here, without that exception, as to whether this was negligent or not. The Coast Guard, these people did get some pretty rough treatment, in a sense, you got the sense that the right hand didn't know what the left hand was doing in the exercise of the discretionary authority. I would say this, Your Honor, the initial notification in October, for whatever reason, the inspector who was notified, either flags weren't raised for him for whatever reason, he didn't either identify concerns about the proposed operation, certainly didn't pass them along. I'd also say, though, that Martin also knew that this was a unique operation, and they too could have pursued permission with a little more vigor. They anticipated it was going to be a problem, they tried to mitigate them, it didn't work. That's correct. That's correct. If the court has no further questions on the discretionary function exception, I will also ask whether the court has any questions with respect to the private party analog argument that we've raised. If not, then I will concede the remainder of my time. Let me ask you about the private party, just in a procedural fashion. We did some looking. There's no reason that one should be considered before the other discretionary function versus private party analog. They're independent, one doesn't precede the other, in the analysis that courts take. I agree. I agree with that. For me, conceptually, it seems to make more sense to talk about private party analog before discretionary function, which is why we did it in the brief. That was, you know, in no way an indication that I thought that the court's ruling on discretionary function was somehow flawed, because I don't think the district court got it right. Okay. Thank you very much, sir. Thank you. Mr. Brough? Your Honors, I'd like to start right where the government left off on the private party analogy. I think that his interpretation is likely agreeable to Martin in that the private party analogy kind of makes sense to do that first to determine whether or not the conduct that is complained of, the tort, is something that falls within the discretionary function exception. I think that logically it makes sense to do that. That is the important part, is one of the torts that is asserted by Martin, there's never been even an argument by the government that that would fall within . . . take that back. In the district court, there wasn't arguments about whether or not it fell into the discretion. That is their tortious silence as to Martin for that five-month period. Martin has showed that a private party, when it understands that a party is relying on basic facts to the transaction and fails to correct a misunderstanding within those facts, because of the reliance on the person receiving those facts, can create a tort liability under negligence law under the Restatement Second of Torts. It's important that even if this court finds that the safety discretion was activated by the government through Section 1224, that that still doesn't cover the fact that the Coast Guard refused to consider the issue for five months and tacitly approved it, basic facts to the transaction, which Martin relied on incurring the cost and the damages in this case. Why wouldn't the Coast Guard, in action for that period of time, also fall within the discretionary function? I mean, there's no statute that gives a mandatory time within which the Coast Guard must act. It begs the question in my mind of what discretion would be there, I guess the discretion whether or not to respond. I mean, doesn't it have the right to allocate its resources and set priorities on what work it does and when it's going to do it? Yes, Your Honor, and I think Indian towing is a great case to bear that in mind, is that while the government does have discretion, whether or not it engages Martin, whether it wants to talk to Martin, however, like Indian towing, once it begins the service, it has to do so prudently and not negligently. In Indian towing, when the government chose to operate the lighthouse, it didn't have an obligation to do so. It then was obligated to do so prudently. Here, the Coast Guard didn't have an obligation to talk to Martin, but once it did, i.e., the October 5th email saying, send me more information, talk to us about this, that activated a duty thereafter to not remain silent, as the restatement second of torts holds would hold liability for a private party, but rather to correct a negligent misrepresentation or to engage Martin to further understand it. And so like Indian towing, once the government engaged, it exercised its discretion. It chose to engage the Marine customer and thereafter had a duty not to be negligent in those communications. If they'd been a private party. Had they been a private party, yes, Your Honor. You want to address the global defense by the government here that game's over as soon as we say this is a safety issue? Your Honor, I think that is, for my client and for others in the Marine community, I don't want the government to say that a mere recitation that something involves safety is enough for them to start regulating activity of the private commerce. In fact, I believe the Fifth Circuit in BF Trawlers has a, or this court in BF Trawlers has a very good blurb that says that immunity is preserved for employees' acts by the discretionary function exemption that assumes that those acts fulfilled rather than ignored or abused the appropriate regulations. And so it's important that if the government's going to invoke safety, that it does so in furtherance of the policy goals in which safety discretion is granted, i.e. section 1224 says look at vessel traffic patterns, look at environmental considers, consider those thoughts of the Marine environment. And so a mere recitation should not insulate any liability on the government in the event where they don't take in the statutorily required factors. And I think that this court's precedent holds very closely that you cannot merely recite to do something and then claim that when you don't handle it in due care, that you're all of a sudden still immune from the liability. You have to use due care. That is one of the key portions of the discretionary function exception text itself that says, with the government's handling of the matter in due care. If there's not due care, there's no discretionary function exception. A mere recitation of safety is not enough. All right, counsel. Thank you, your honors. All right. Thank you, gentlemen. We have your case.